## Milton v. Commonwealth.

(Decided March 18, 1938.)

C. A. DENNY for appellant.

HUBERT MEREDITH, Attorney General, and GUY H. HERD-MAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

Appellant, B. M. Milton, has appealed from a judgment of the Muhlenberg circuit court sentencing him to sixteen years in the penitentiary for manslaughter. The indictment charged him with the murder of Estill Render. A reversal of the judgment is asked upon the grounds (1) that the evidence is insufficient to take the case to the jury, or if he be mistaken in that, the verdict is flagrantly against the evidence; and (2) the court did not properly instruct the jury.

(1) The homicide occurred in Central City, Ky., in the restaurant of John Render, colored, a brother of deceased, on a night in October, 1936, at about 2:30 a. m.

It is disclosed by the evidence that early in the night appellant went to the restaurant where the homicide occurred and at that time John Render, the owner of the restaurant, and Lilburn Calvert, and his wife, Martha Calvert, were there and appellant called Lilburn Calvert from the building apparently for the purpose of talking with him. John Render went home in the early part of the night and left his brother, Estill, the deceased, in charge of the restaurant. According to the evidence of John Render, after he went home he saw appellant in his, Render's back yard peeping through the window and Render ordered him from the premises. Then later at about 2:30 a. m. Lilburn Calvert and his

wife again returned to the restaurant and appellant was there, but the evidence is not clear whether he had been there all the time since the early part of the night or whether he had left after the early visit and had returned. Appellant and Lilburn Calvert engaged in a fight and appellant had a pistol in his belt or holster, and during the fight Martha Calvert took the pistol from the holster and went into a side room. The deceased and Nick Carter separated appellant and Calvert and the fight stopped. Immediately appellant started to leave the restaurant by a side door, but upon finding the door locked, he turned and went into the side room where Martha Calvert was with the pistol. According to his evidence, up to this time he had not missed his pistol, but on seeing the pistol in Martha Calvert's hand he looked at his belt or holster for it and, it not being there, he again looked at the pistol and recognized it as being his and asked her to give it to him and she pointed the pistol at him but he grabbed it and took it out of her hand. He turned and started into the room or main restaurant and as he went through the door the pistol went off and the bullet took effect under the right arm of deceased, who was standing within a few feet of appellant, and went practically straight through his body. He died within a few hours thereafter.

Nick Carter testified that appellant went into the room where Martha Carter was to get his pistol and as he came through the door the pistol went off. This witness does not state the position in which appellant was holding the pistol when he came through the door or when it fired. The witness further stated that appellant and deceased were on friendly terms and had no words or trouble on that night or at any other time, so far as he knew.

Lilburn Calvert testified that when appellant came through the door with the pistol he had it down by his side, "hanging down about arm's length," and it was in that position when it fired. This witness also said that there had been no words or trouble of any kind between the appellant and deceased and that their relations were very friendly.

Martha Calvert testified that while deceased and her husband, Lilburn Calvert, were fighting she saw the pistol and grabbed it and took it out of his belt and took it into the side room and after the fight was over

appellant came into the room and took the pistol out of her hand and started back into the restaurant and as he went through the door the pistol went off. She said she did not see the pistol when it fired and did not know what position it was in.

All the witnesses who were present testified that when appellant shot the deceased he turned and walked out of the room and never said a word to any one. He made no apologies or explanations or offer any expressions of regret of any kind.

Appellant, testifying in his own behalf, said that he had known deceased for more than twenty years and that their relations had been very friendly and that they had never had any trouble at any time. He said that while he and Lilburn Calvert were fighting Martha Calvert took his pistol, but he did not miss it until he stepped into the room and saw it in Martha Calvert's hand and when he asked her for the pistol she threw it on him and he grabbed it and took it away from her and started through the door and the pistol went off. He said that he did not intentionally fire the pistol and could not account for letting it off unless Martha Calvert had cocked it and it was in that position when he took it from her; that he had no reason for shooting deceased or any one else, and the firing of the pistol was an accident. He said that when the pistol went off he was holding it down by his side. He related what happened immediately after the pistol fired, in the following language:

"Estill Render said: 'Oh Brother Milton, you have shot me.' I said: 'Oh Estill, you know I wouldn't have shot you for nothing in the world ' I says: 'Where was you shot at?' and he pointed to his side, right there (indicating). I said: 'No,' he says: 'Yes'. I said: 'Oh Lord have mercy, what will I do?' and he commenced to give down on his knee, and I stayed there for a few minutes, and I begin to think, and I was afraid of John Render, and I went on out and went home."

As we have pointed out above, appellant's evidence quoted above relating to what happened immediately after the shooting is squarely contradicted by the evidence of all the other witnesses who were present and testified that after the pistol fired appellant walked out

of the room without saying a word to the deceased or any one else. Otherwise the evidence of the commonwealth's witnesses and appellant is practically the same. If the shot was an accident, it is natural that appellant would have made some explanations or expressions of regret, etc., as he said he did in his evidence. But the effect of his evidence is greatly impaired by the evidence of the other witnesses who positively contradicted him on that point. In the light of all the evidence of the other witnesses, it cannot be said that they were hostile to appellant. They all testified that he had had no trouble with the deceased and so far as they knew their relations were friendly, and they corroborate him on practically every point except as to his conversation and kindness toward the deceased after he was shot, as claimed by him.

One of the witnesses for the commonwealth testified that when the pistol fired appellant was holding it down at arm's length and it was in that position when it fired. Perhaps this witness only noticed appellant's arm was hanging straight down, but that did not mean necessarily that the pistol was pointed toward the floor. He could have held his arm straight down by his side with the pistol pointed toward deceased or other occupants of the room. The position of the pistol in his hand is the material point, not the position of his arm down to his hand. Thus it is seen that appellant's testimony that the pistol was pointed downward when it fired is contradicted by the physical facts. It would have been physically impossible for the bullet to have taken effect under the arm of deceased who was standing within a few feet of appellant if it was pointed toward the floor. There is no claim that the bullet struck the floor and ricocheted and struck the deceased, nor did appellant undertake to explain how the bullet could have struck deceased as it did. While the evidence shows that there was a friendly relation between appellant and deceased and perhaps no motive shown for the shooting of deceased, except that appellant was in a belligerent state of mind and resented the deceased separating him and Calvert while they were fighting. Furthermore, if it be conceded that appellant did not intend to shoot deceased, yet in the circumstances, particularly in view of the physical facts, the jury had the right to believe and perhaps did believe that although the firing of the

pistol was not intentional, appellant had it pointed toward the deceased and was handling it in a reckless manner, and, if so, under the instructions given the jury, it had the right to find him guilty of voluntary manslaughter under the instruction dealing with reckless use of firearms. From the evidence as a whole, we are unable to say that it is insufficient to sustain the verdict.

(2) Next it is insisted that the court erred in failing to instruct the jury on self-defense. It is obvious that such an instruction was wholly unnecessary, because appellant does not claim that deceased was attempting to harm him, but claims that the firing of the pistol was an accident. There is no evidence either direct or circumstantial necessitating a self-defense instruction.

It is also insisted that the court should not have instructed the jury on voluntary manslaughter based on sudden heat and passion, because appellant and deceased had had no controversy and there is no evidence indicating that appellant entertained any ill feeling toward deceased. But, as we have pointed out above, the jury may have inferred from the evidence that appellant was in a belligerent state of mind and resented deceased's interference with his fight with Calvert. We think the evidence is sufficient to warrant a conviction under either instruction on voluntary manslaughter.

Finding no error prejudicial to the substantial rights of appellant, the judgment is affirmed.